The opinion of the court was delivered by
Watkins, J.
This suit is for the recovery of ten thousand dollars damages against the defendant for injuries* sustained by the plaintiff’s infant child of three years of age, it being run over by one of defendants’ street cars, which was operated by electricity, and its *1220 arm so broken and crushed that it had to be amputated, leaving it in a permanently crippled condition.
The statement of the petition is that the accident occurred at the intersection of Texas and Crocket streets, in the city of Shreveport, defendants’ car being at the time operated on Texas street in carrying passengers. That at the time of the occurrence plaintiff’s child was standing at or near the railroad track, where there is a curve or turn, thus being in a position in which the motorman operating the car could have easily seen it had he been at his proper place and carefully attending to his duties. That the accident was occasioned by the gross carelessness and negligence on the part of the railroad company, its servants, agents and employees. That the injury inflicted upon the child caused it great pain and suffering, and resulte I in its being maimed and disfigured for life.
The defendants’ answer is a general denial, couple! with the plea of contributory negligence on the part of the child and its parents.
The cause was tried by a jury, who rendered a verdict in favor of the plaintiff for three thousand dollars, and from the judgment of the court thereon based, the defendant has appealed. In this court the plaintiff and appellee filed an answer to the appeal and demands an amendment of the decree so as to award him the full amount claimed in his petition.
The testimony of all the witnesses concurs as to the following established facts, viz.: That the accident happened in open daylight, while the car was slowly moving down grade of its own weight and momentum, the electric current having been cut off; that the track and car were in apparently good order, and the motorman in charge of the car was a sober, prudent and experienced employee; that not one of the several passengers who were in the car at the time either saw or knew of the happening of the accident.
One witness states that as he was entering the car he saw the car strike the child, but that he did not notice what the motorman was doing at the time. Another witness states that as he came to the car, he saw it just as it was checking up, and just then the little boy rolled out from under it.
A physician from the Charity Hospital testifies that he was a passenger on the car on the morning of the occurrence, and the substance of his statement is as follows:
That he was sitting near the fare-box when a passenger came in *1221 and spoke to him, handing a quarter of a dollar to the motorman to make change so he could deposit his fare in the fare-box. Heard the passenger ask the motorman for change, and saw the motorman give him the change. That just as he gave him the change witness observed the motorman apply the brak > in. a rather excited manner; and soon afterwards all the passengers became excited and stood up —the witness among the number. That just about that time he heard a little child scream, and looking out of the window he saw a little fellow holding his arm in his hand. That he ran out quickly and caught hold of the arm to prevent a hemorrhage. That upon learning whose child it was he directed that he be at once carried home; and that he went there also, and applied a bandage on the broken limb, and just as speedily as possible telephoned to the hospital for his instruments and amputated it. That he amputated it just about the junction of the upper and middle third, just above the elbow. That the arm was crushed above the elbow, and there was no such thing as saving the arm — amputation being absolutely necessary.
Another witness corroborates the physician’s statement with reference to the motorman giving a passenger change about the moment of the occurrence. He heard the cry of alarm made by some passengers, and saw the motorman catch hold of his brake “ as quickly as possible ” and try to stop the car, “ but it was alittle too late to stop the car.” He states that there was no conductor on the car; and defendant’s cars are not provided with conductors — the double duty being, by the company’s regulations, imposed on the motorman of handling the car and making change for the passengers. He says that when the car is in motion, the motorman’s post of duty is on the front platform of the car, and that he occupies a position so he can look on either side.
That the ear is provided with a brake on the front platform, so that he can arrest the speed of the car; and also with an apparatus so that he can cut off and turn on the electric current at will. He says that, at the place where the accident occurred, there is a switch, and the car passes slightly down-grade from the switch to the main line; and that in thus passing off of the switch it is customary for the motorman to slow up by cutting off the current and permitting the ear to run down of its own momentum.
Another witness who had a seat in the car by the side of the physician who testified, gives much the same relation of facts as the lat *1222 ter did. He speaks of the passenger who came in and walked up to the motorman to get change to pay his fare. He states that “the motorman turned around to make the change for him about the time (the car) was going out of the switch.” That it had gone probably fifteen or twenty feet (while) he was making change; and he turned partially around so as to make the change for the passenger. That immediately after haying received his change, the passenger made some remark and the motorman commenced turning his brake to stop the car.
Another witness, standing at a blacksmith shop near the switch, saw the car just as it came in contact with the child and push him over. He ran to the child immediately and picked him up and carried him into his father’s house, which was near by.
Another witness, who was driving his cart, states that he was in the rear of the car, about thirty feet distant, and a little to the left of it, driving in the same direction in which the car was moving, and saw the accident. Saw the car just as it was checking up, a”d the little boy rolling out from under it.
The passenger who was obtaining change from the motorman for the purpose of paying his fare, states that he was standing at the front door when the accident occurred. He says that while the motorman was engaged in making change for him the little boy was standing outside of the railroad track — possibly at a distance of three to six feet. That when the car was within three feet of the child, he took a notion to run across the track to the other children who were on the opposite side, and came in collision with the car.
There were five or six children playing on the track before the car had reached the point where the accident happened; but they had moved on upon the approach of the car, separating from the little fellow who was run over. That, as he observed the movement of the little boy, he caught at the brake, and the motorman caught it at that instant and checked the car. That he thinks the motorman saw the child just aboutthe time he started, but he did not have sufficient time to stop the car — it was too late.
The foregoing is a fair summary of all the testimony which was adduced on the trial in favor of the plaintiff, and nothing to the contrary was developed by the witnesses for the defendant.
It is a noteworthy fact that the motorman, White, who was operating the car which inflicted the injury, was neither summoned nor *1223 interrogated as a witness for the defendant, notwithstanding he was known to have been in the adjoining parish at the time of the trial, he being no longer in the service of the company.
Following a general rule which has ever been in favor with this court, we feel at liberty to presume that if he had been produced as a witness by the defendant, his evidence would have been averse to its pretensions.
Having been the motorman who had charge of the car, and through whose carelessness and negligence the accident and injury happened, it was defendants’ duty to have placed him on the stand and purged him of his fault, if indeed he could have done so, and as he was neither produced nor interrogated, all the legal presumptions are unfavorable to his testimony.
Imprimis we may dispose of the defendant’s charge of contributory negligence, in respect to the child, by observing that it was only three years old and incapable, per se, of contributory fault; and in respect to that of the parents there is no proof of contributory fault of any kind. Westerfield vs. Levis Bros., 43 An. 63.
Mr. Thompson states the rule thus pertinently, viz.:
1 ‘ Although a child of tender years may be in the highway through the fault or negligence of its parents, and so be improperly there, yec if he be injured through the negligence of the defendant, he is not precluded from his redress. If the defendant knows that such a person is in the highway, he is bound to a proportionate degree of watchfulness, to the utmost circumspection, and what would be but ordinary neglect in'regard to one whom he supposed to be a person of full age and capacity, would be gross neglect as to a child, or one known to be incapable of escaping danger.” 2 Thompson on Negligence, 1129.
The same author says:
“ It is the duty of the driver of street cars not only to see that the railroad track is clear, but also to exercise a constant watchfulness for persons who maybe approaching the track.” 1 Thompson on Negligence, 398.
But in even clearer and more cogent terms Mr. Beach states the rule thus:
“If, however, he” (the engineer or driver) “sees a child of tender years upon the track, or any person known to him to be, or from his own experience giving him good reason to believe that he *1224 is insane, or badly intoxicated, or otherwise insensible to danger, or unable to avoid it, he has no right to presume that he will get out of the way, but should act on the belief that he might not, or would not, and should therefore take means to stop his train in time.” Beach on Contributory Negligence, 395.
Defendant invokes the rule as announced in Gallagher vs. Railroad Company, 37 An. 288, to the effect that “ a car driver can be justly charged with negligence only when he fails to observe or do something he ought to have seen or done, and would notice or do with ordinary vigilance; when he fails to be prepared for something visible, or at least of probable occurrence, or that might be reasonably expected of him.
“ If the accident happened from a sudden and unanticipated act, which is the result of the thoughtless impulse of a child, of which human forethought could not be prescient, no liability attaches to the driver or to his employer.”
The rule thus formulated is undeniably correct, and does not differ from the rule we have quoted from Thompson and Beach. But is this one such a case? Evidently not. For instead of the motorman of defendant’s car being on the lookout while his car was slowly descending the switch to the main track, propelled by its own momentum, he was engaged in making change for a passenger; and, in consequence of his attention having been thus diverted, he failed to observe the perilous situation of the child in time to arrest the progress of the car, and prevent the happening of the untoward event. It seems quite apparent to us that if the motorman had postponed making change for the passenger until his car had passed off the switch, he could, and most likely would, have seen the child, and averted the accident.
The judge a quo, in his charge to the jury, very correctly said:
“ A railway company is bound to keep a proper lookout, especially in populous localities, for objects on its tracks ahead of a moving train, and if' a child is seen thereon it should bring its train to a stop; and upon its failure to do so, it is chargeable with actionable negligence.
“ The same rule applies to an electric car company, and in case of children of tender age, the proper inquiry is, whether the person in charge of the motor car failed to observe, or do something which he *1225 ought to have seen or done, and which he would have seen or done with ordinary vigilance.”
This charge, in our view, is in strict keeping with the rule that is announced by authors and jurists, and that the jury were evidently mindful of the judge’s instructions in rendering a verdict in favor of the plaintiff. We think a case of damages is made out by the law and the evidence, but our opinion is that the allowance made by the jury is not enough, and that it should be increased to five thousand dollars.
It is therefore ordered that the amount of damages be increased to five thousand dollars, and as thus amended the judgment be affirmed.
Nicholls, O. J., absent.